# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

TYSON SCOTT NAWANNA,

Defendant.

No. CR 17-4019-MWB

**SENTENCING OPINION AND STATEMENT OF REASONS PURSUANT TO 18 U.S.C. § 3553(c) EXPLAINING A POLICY DISAGREEMENT WITH THE METHAMPHETAMINE GUIDELINES**

## TABLE OF CONTENTS

I. INTRODUCTION................................................................. 3
    A. *Pre-Sentencing Proceedings* .......................................... 3
    B. *Methamphetamine Guidelines Arguments* ...................... 6

II. LEGAL ANALYSIS ......................................................... 10
    A. *Policy Disagreements With Guidelines* ......................... 10
        1. *Standards* ............................................................ 10
        2. *Policy disagreement with the methamphetamine Guidelines*.............................................................. 11
            a. *Previously recognized flaws*.................................. 11
            b. *The flaw of drug purity as a proxy for culpability*......................................................... 12
    B. *Application*.............................................................. 20

III. CONCLUSION .............................................................. 24

The United States Sentencing Guidelines[1] differentiate between methamphetamine mixture and actual (pure) methamphetamine or "ice."[2] That difference is the primary basis for the defendant's motion for a downward variance. Even though he is a first-time drug offender who has never been in prison, he argues that he faces a "breathtakingly high" Guidelines sentencing range of 360 months to life, where the methamphetamine at issue was treated as actual (pure) methamphetamine or ice. He argues that the harsh methamphetamine Guidelines overstate his culpability and should be rejected on policy grounds. Specifically, his argument, of first impression for me, is that the methamphetamine Guidelines are based on a flawed premise, set out in U.S.S.G. § 2D1.1, cmt. n.27(C), that drug purity is a proxy for culpability. The prosecution responds that, although I am free to place whatever weight I wish on the various advisory Guidelines, the defendant's advisory Guidelines sentencing range is appropriate in this case, because it reflects the dangerous role the defendant played in dealing pure methamphetamine. Thus, this case requires me, once again, to consider the question of the merits of the advisory Guidelines sentencing range for a defendant convicted of methamphetamine offenses. In *United States v. Hayes*, 948 F. Supp. 2d 1009 (N.D. Iowa 2013), I followed the lead of two other federal district judges by reducing a

---

[1] I refer to the United States Sentencing Commission as the "Commission" and the United States Sentencing Guidelines as the "Guidelines" throughout this opinion. The defendant's advisory Guidelines sentencing range was determined using the 2016 Guidelines Manual incorporating all Guideline amendments.

[2] The Guidelines treat "ice," described as "a form of methamphetamine that typically was 80 to 90 percent pure, as if it were 100 percent pure methamphetamine." U.S. SENTENCING COMM'N, METHAMPHETAMINE: FINAL REPORT OF THE WORKING GROUP 7 (1999), 9, available at http://www.ussc.gov/Research/Working_Group_ Reports/Drugs/199911_Meth_Report.pdf [hereinafter METHAMPHETAMINE REPORT]; *see also* U.S.S.G. § 2D1.1(c) Notes to Drug Quantity Table n.(C) (U.S. Sentencing Comm'n 2016).

methamphetamine defendant's advisory Guidelines sentencing range by one third, on the basis of a policy disagreement with the methamphetamine Guidelines. This sort of variance was for low level, non-violent, addict offenders. This opinion, which supplements my rationale on the record at the defendant's sentencing hearing, explains why I find that a similar reduction, based on a different calculation, is appropriate in this case.

## I.    INTRODUCTION

### A.    Pre-Sentencing Proceedings

In a March 22, 2017, Indictment, defendant Tyson Scott Nawanna was charged with three methamphetamine offenses. Count 1 charged that, from about 2015 and continuing to on or about March 16, 2016, Nawanna conspired to distribute 500 grams or more of methamphetamine mixture containing 50 grams or more of actual (pure) methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Counts 2 and 3 charged that, on or about January 16, 2016, and March 1, 2016, respectively, Nawanna distributed 5 grams or more of actual (pure) methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). On May 18, 2017, Nawanna pleaded guilty to all three counts of the Indictment, without a plea agreement, before United States Magistrate Judge Kelly K.E. Mahoney, who recommended that I accept Nawanna's guilty plea. On June 6, 2017, I accepted Nawanna's guilty plea. After various continuances, Nawanna's sentencing hearing was set for January 24, 2018.

On January 17, 2018, the United States Probation Officer filed a Presentence Investigation Report (PSR). Because this opinion focuses on the methamphetamine Guidelines, my summary of the PSR will focus on the Offense Conduct statement and the Guidelines calculations.

The PSR indicates that, between 2015 and late 2016, Nawanna conspired with others to distribute at least 33.158 grams of actual (pure) methamphetamine and 4,406.39 grams of ice.[3] Although Nawanna objects to these quantities, he does not dispute the resulting base offense level on [**] procedural grounds. Nawanna maintained an aggravating role in the conspiracy, specifically, because he had one person who acted as his "driver" and another who acted as his "muscle." On January 16, 2016, the date of the offense charged in Count 2, a confidential informant bought approximately one-half ounce of methamphetamine from Nawanna. Laboratory analysis of that methamphetamine confirmed that it weighed 12.9 grams, was 99.6 percent pure, and contained 12.8 grams of actual (pure) methamphetamine. On March 16, 2016, the date of the offense charged in Count 3, Nawanna was arrested during an undercover buy in which Nawanna agreed to sell a half ounce of methamphetamine to a cooperator. Surveillance officers saw a vehicle driven by Nawanna's "driver," in which Nawanna and his "muscle" were passengers, arrive at the arranged location. After Nawanna called the cooperator to come out to the vehicle, law enforcement officers detained Nawanna, his "driver," and his "muscle," and searched them and their vehicle. They found that the "muscle" was holding a loaded Smith and Wesson Model 63, .22 caliber revolver. The officers also seized a total of 12.78 grams of methamphetamine from the vehicle. That methamphetamine was not tested but was treated as ice for sentencing purposes. The officers also found an AR-15 in the trunk of the vehicle.

The three counts of the Indictment are grouped for purposes of Guidelines calculations pursuant to U.S.S.G. § 3D1.2(d). Nawanna's base offense level is derived from the total of 88,791.16 kilograms of marijuana equivalency, consisting of 33.158

---

[3] This is the total, in grams, of the separate transactions identified in the PSR as involving ice.

grams of actual (pure) methamphetamine (663.16 kilograms marijuana equivalency) and 4,406.39 grams[4] of ice (88,127.80 kilograms marijuana equivalency), where 1 gram of actual (pure) methamphetamine or ice is deemed equivalent to 20 kilograms of marijuana. U.S.S.G. § 2D1.1, cmt. n.8(D). The base offense level for at least 3,000 kilograms of marijuana but less than 90,000 kilograms is 36. U.S.S.G. § 2D1.1(c)(2). Nawanna's offense level is increased by 2 levels for the specific offense characteristic of possession of a dangerous weapon, pursuant to U.S.S.G. § 2D1.1(b)(1), then increased by 3 levels as an adjustment for his role in the offense as a manager or supervisor (but not an organizer or leader) and criminal activity involving five or more participants, pursuant to U.S.S.G. § 3B1.1(b). With no adjustment for obstruction of justice, Nawanna's adjusted offense level is 41. The PSR also scores a 2-level decrease for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a), and another 1-level decrease for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(b), assuming that the prosecution would make the required motion, which the prosecution did do. Thus, Nawanna's total offense level is 38.

Nawanna had 12 criminal history points, based on prior offenses. Eight of Nawanna's criminal history points were for various automobile driving offenses. He had no prior felony or misdemeanor drug or firearm offenses. Because 8 of his criminal history points were for offenses that did not involve a sentence of at least 60 days, only 4 of those 8 could be counted, pursuant to U.S.S.G. § 4A1.1(c). Thus, Nawanna ultimately had 8 points scored for prior offenses. Nawanna also received 2 additional

---

[4] This is the total, in grams, of the ice identified in the "Offense Conduct" portion of the PSR. The Probation Office rounded this amount and converted it to 4.4064 kilograms in paragraph 24 of the PSR. The Probation Office used the original number of grams of ice for the marijuana conversion, however, to arrive at 88,127.80 kilograms of marijuana equivalency.

criminal points, pursuant to U.S.S.G. § 4A1.1(d), for committing the instant offense while under a criminal justice sentence for a prior offense, bringing his total to 10. With a criminal history category of V, based on 10 criminal history points, pursuant to U.S.S.G. § 4A1.1, and a total offense level of 38, Nawanna's advisory Guidelines sentencing range is 360 months to life.

On January 17, 2018, Nawanna filed the Motion For Downward Variance now before me. Extensive briefing, some at my request, followed, including dueling reply briefs. I sentenced Nawanna on April 25, 2018.

### B.     Methamphetamine Guidelines
### Arguments

In Nawanna's original brief in support of his Motion For Downward Variance, Nawanna argues, *inter alia*, that the quantity and purity of methamphetamine involved in the offense play an outsized role in his advisory Guidelines sentencing range, because of the 10-to-1 ratio between actual (pure) methamphetamine (or ice) and methamphetamine mixture, pursuant to U.S.S.G. § 2D1.1, cmt. n.8(D). He contends that the ratio is based on an outdated premise that there is a supposed link between drug purity and culpability set out in U.S.S.G. § 2D1.1 cmt. n.27(C). That comment states, "[T]hat a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." Nawanna argues that, contrary to this premise, methamphetamine recently seized in the Sioux City area is often 97, 98, or 99 percent pure, and that the recent statewide average purity in Iowa is 97 percent. In short, he argues that everyone involved with methamphetamine today, whether a drug lord or an end user, has access to a substantially pure, uncut product.

In his briefing Nawanna argues that U.S.S.G. § 2D1.1, cmt. n.27(C), embodies the Guidelines' unsupported justification for the 10-to-1 ratio. He adds that this

justification first appeared in application note 9 to the original version of U.S.S.G. § 2D1.1 in 1987. Nawanna points out that, from the beginning, the Commission has followed congressional directives to punish more harshly offenses involving pure versions of certain drugs, including methamphetamine. He argues that there is no empirical basis for the Commission's decision to treat offenses involving pure methamphetamine more severely than offenses involving methamphetamine mixture, so that the difference in treatment of the two is entitled to little deference.

Next, Nawanna argues that, because today's methamphetamine is substantially pure, purity is not a proxy for relative culpability, citing DEA, *2017 National Drug Threat Assessment* 70 (Oct. 2017), concerning average purity of one gram of methamphetamine. The problem is worsened, Nawanna contends, because not all methamphetamine seized from a defendant or his co-conspirators is tested for purity, and the reasons that it is or is not tested are completely arbitrary, with no relation to a defendant's culpability or danger to society. He asserts the problem is further worsened, because the Eighth Circuit Court of Appeals permits courts to apply the purity rate for a quantity of tested methamphetamine to a larger quantity of untested methamphetamine, and then sentence a defendant based on the resulting quantity of actual (pure) methamphetamine or ice—and a court may treat methamphetamine as pure, even if no quantity was recovered or tested, if there is sufficient circumstantial evidence of its purity. Nawanna argues that, because enhanced punishment is based on drug purity as a proxy for role in the offense, the enhancements for methamphetamine purity and aggravated role in the offense punish a defendant twice for the same reason. Finally, Nawanna argues that the Commission's own data show a significant disparity across judicial districts in the treatment of methamphetamine as pure or a mixture.

In its response, the prosecution acknowledges that I am free to place whatever weight I wish on the various advisory Guidelines, but that, under the particular facts and

circumstances of this case, the advisory Guidelines sentencing range is appropriate and reflects the dangerous role Nawanna played in dealing pure methamphetamine in the Northern District of Iowa. Specifically, the prosecution points out that Nawanna's advisory Guidelines sentencing range includes a 2-level increase for routinely being either armed or having guns around when he was dealing methamphetamine and a further 3-level increase for his use of others in his drug operation as "muscle" or to deal the drugs, and that Nawanna has a significant criminal history. The prosecution argues that the rise in purity of methamphetamine over time is not the end of the story, because the price of methamphetamine, the source of it, and even the amounts that end users consume have also changed, so that the 10-to-1 ratio may reflect the amount of damage the drug can do. In particular, the prosecution argues that the quantity of pure methamphetamine attributed to Nawanna amounts to over 17,000 dosage units.

The prosecution also points out that no United States Circuit Court of Appeals has provided guidance to district courts to reject the methamphetamine Guidelines, presumably because of the district courts' wide discretion to decide the weight of the Guidelines. The prosecution argues that it is internally inconsistent for Nawanna to complain that little methamphetamine was tested, but that, because almost all methamphetamine is over 90 percent pure, the Guidelines penalizing pure methamphetamine more harshly should be rejected. Indeed, the prosecution argues that it would be more logical to treat all methamphetamine as pure, because doing so would more appropriately indicate culpability based on larger quantities. The prosecution also disputes Nawanna's contention that he is being punished twice for his role in the offense, first based on drug purity, then on his actual role, because he is only being punished once for using underlings to act as "muscle," as his "driver," and as "hand to hand" delivery men. The prosecution contends that Nawanna's argument could also result in perverse sentencing results. Finally, the prosecution contends that the supposed disparity in

treatment of methamphetamine as a mixture or pure in different districts does not bear the weight Nawanna contends, because the cited statistics reveal no causation for the difference.

In reply, Nawanna points out that the prosecution does not appear to dispute that the only express basis for the 10-to-1 ratio between actual (pure) methamphetamine and methamphetamine mixture in the Guidelines is that drug purity is a proxy for a defendant's role in the offense; that methamphetamine today is uniformly pure; or that there is no empirical basis for the 10-to-1 ratio. Nawanna argues that the prosecution's argument about dosage units, which the prosecution admits is based on anecdotal experience, confuses purity with potency. Nawanna argues, however, that the prosecution's observation about dosage units does not account for the potency difference between "pure" methamphetamine consisting only of highly potent d-methamphetamine, which is made using ephedrine or pseudoephedrine, and less potent "pure" methamphetamine, made using the "P2P" method,[5] which contains both d-methamphetamine and l-methamphetamine. In short, he reiterates his contention that, because the 10-to-1 ratio punishes actual (pure) methamphetamine and ice more harshly, even though they are now a universal factor in methamphetamine cases, I should reject it.

At oral arguments, the prosecution "largely agreed" with Nawanna's statement of the lack of any empirical basis for the current methamphetamine Guidelines and the "factual underpinnings" of his argument that there has been a trend in recent years toward much higher purity of methamphetamine at all levels of distribution. The parties further

---

[5] The "P2P" method uses 1-phenyl-2-propanone. *See* James K. Cunningham, *et al., Mexico's Precursor Chemical Controls: Emergence of Less Potent Types of Methamphetamine in the United States,* DRUG AND ALCOHOL DEPENDENCE 125, 125-26 (2013).

agreed that they were unaware of any statement in the Guidelines or elsewhere of why only certain controlled substances, including methamphetamine, are singled out in the Guidelines themselves for enhancement based on purity, while others, such as heroin, are not.

## II.    LEGAL ANALYSIS

### A.    Policy Disagreements With Guidelines

#### 1.    Standards

In the years since my decision in *Hayes*, the Eighth Circuit Court of Appeals has reiterated that a district court may deviate from the Guidelines because of a policy disagreement, but frequently adds that a district court is not required to do so.  *See, e.g., United States v. Beckman*, 787 F.3d 466, 499 (8th Cir. 2015) ("Yet, 'even "assuming that a sentencing court may disregard [a guideline] on pure policy grounds,"' the United States Supreme Court has not held '"that a district court must disagree with any sentencing guideline, whether it reflects a policy judgment of Congress or the [Sentencing] Commission's characteristic empirical approach."'" (quoting *United States v. O'Connor*, 567 F.3d 395, 398 (8th Cir. 2009) (alterations as in *Beckman*, in turn quoting *United States v. Barron*, 557 F.3d 866, 871 (8th Cir. 2009)); *United States v. Keys*, 785 F.3d 1240, 1244 (8th Cir. 2015) ("The district court considered Keys's assertions and declined to vary from the Guidelines based on a policy disagreement.  The district court was not required to vary for a policy issue and acted within its discretion when it did not."); *United States v. Manning*, 738 F.3d 937, 947 (8th Cir. 2014) (explaining that "while a district court may choose to deviate from the guidelines because of a policy disagreement, a district court is not required to do so."  (internal citations and quotation marks omitted)); *United States v. Parker*, 762 F.3d 801, 812 (8th Cir. 2014) ("[A]s we learned in a summary reversal, 'district courts are entitled to reject and vary

categorically from' at least some of the 'Guidelines based on a policy disagreement with those Guidelines.'" (quoting *Spears v. United States*, 555 U.S. 261, 265–66 (2009) (*per curiam*)).  Perhaps, then, it is not surprising that the Eighth Circuit Court of Appeals does not seem to have provided any guidance on when rejection of a Guideline on policy grounds is more or less appropriate.

Thus, as in *Hayes*, I conclude that such a policy-based rejection may be appropriate "when those Guidelines provisions 'do not exemplify the Commission's exercise of its characteristic institutional role.'"  948 F. Supp. 2d at 1015 (quoting *United States v. Beiermann*, 599 F.Supp.2d 1087, 1096 (N.D. Iowa 2009), in turn quoting *Spears*, 555 U.S. at 264).  More specifically, a variance based on a policy disagreement is particularly appropriate when the Guidelines range results in sentences greater than necessary to achieve sentencing objectives and the Guidelines are not based on empirical data and national experience, but on statutory directives.  *Id*. at 1031 (citing *Kimbrough v. United States*, 552 U.S. 85, 96 (2007), and *Gall v. United States*, 552 U.S. 38, 46 n.2 (2007)); *see also id*. at 1027 (explaining that the methamphetamine Guidelines are not the result of empirical data and national experience, but statutory directives).  Also, as I observed in *Hayes*, policy disagreements are "healthy," because they serve a valuable function in the process of constantly improving the Guidelines, which were intended to be evolutionary in nature.  *Id*. at 1031 (citing *United States v. Ysidro Diaz*, No. 11–CR–00821–2 (JG), 2013 WL 322243, at *13 (E.D.N.Y. Jan. 28, 2013)).

### 2. *Policy disagreement with the methamphetamine Guidelines*

#### a. *Previously recognized flaws*

The parties and I agree that the methamphetamine Guidelines currently maintain a 10-to-1 ratio between methamphetamine mixture and actual (pure) methamphetamine.  In *Hayes*, I concluded that it was appropriate to reject the methamphetamine Guidelines on policy grounds, because the Commission had abandoned its institutional role and reliance

on any empirical data in promulgating those Guidelines and had, instead, promulgated the Guidelines based on statutory directives, 948 F. Supp. 2d at 1018-27; the methamphetamine Guidelines are excessive, *id*. at 1027-29; and the methamphetamine Guidelines ranges are not "heartlands," *id*. at 1029-31. In an email prior to setting the briefing schedule on the drug purity issue, I gave the prosecution the opportunity to present any evidence that it wanted to support an empirical basis for the difference in treatment between ice and a methamphetamine mixture in the Guidelines. The prosecution chose not to do so. Indeed, in its briefing and at oral arguments, the prosecution, to its credit and with great candor, did not challenge Nawanna's contention that the 10-to-1 ratio is unsupported by and not based on empirical evidence. Thus, the same reasons stated in *Hayes* justify rejection of the methamphetamine Guidelines on policy grounds, again, in this case. *Id*. at 1031-33.

### b.    *The flaw of drug purity as a proxy for culpability*

What is new in this case is that Nawanna argues that the justification in the Guidelines themselves for the purity-driven methamphetamine Guidelines is erroneous or, at least, has been erroneous for the last several years. He finds that justification stated in U.S.S.G. § 2D1.1, cmt. n.27(C), entitled "Upward Departure Based On Unusually High Purity":

> Trafficking in controlled substances, compounds, or mixtures of unusually high purity may warrant an upward departure, except in the case of PCP, amphetamine, methamphetamine, hydrocodone, or oxycodone for which the guideline itself provides for the consideration of purity (see the footnote to the Drug Quantity Table). *The purity of the controlled substance,* particularly in the case of heroin, *may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution. Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution,*

> the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs. As large quantities are normally associated with high purities, this factor is particularly relevant where smaller quantities are involved.

U.S.S.G. § 2D1.1, cmt. n.27(C) (emphasis added); *see United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1255 (D.N.M. 2017) (recognizing that the underlying theory of the purity-based methamphetamine Guidelines is found in this comment). Nawanna points out that this comment expressly notes that upward departures for purity are not appropriate in methamphetamine cases, because the methamphetamine Guidelines already embody consideration of purity based on this justification. *Id.*[6] Nawanna argues that such a justification, even if it was once supportable, bears little or no relationship to the methamphetamine available today.

More specifically, Nawanna argues, and I find, that, because today's methamphetamine is substantially pure, purity is not a proxy for relative culpability. Nawanna concedes, and I agree, that there was once some truth to the Commission's assumption that large quantities are associated with high purities, because methamphetamine was cut as it worked its way down to the street-level dealer or user, but that is no longer the case. Instead, data from the Drug Enforcement Agency (DEA) show that, from 2011 to 2016, the average purity of one gram of methamphetamine has ranged from a low of 85.5 percent in early 2011 to almost 95 percent in early 2014, and most recently, for the third quarter of 2016, averaged 93.5 percent pure. That trend is

---

[6] There is no explanation, however, even in this comment, for why PCP, amphetamine, methamphetamine, hydrocodone, and oxycodone should be distinguished from other drugs, such as heroin, by addressing purity in the applicable Guideline itself, rather than in an upward departure.

clearly demonstrated in the following chart, from DEA, 2017 National Drug Threat Assessment 70 (Oct. 2017), which Nawanna included in his brief:



Nawanna contends, and I find, that the trend is the same in Iowa, because information from the Iowa Governor's Office of Drug Control Policy shows that the average purity of methamphetamine in this state in both 2015 and 2016 was 97 percent, in 2014 it was 95 percent, and in 2012 it was 87 percent. *See* Governor's Off. of Drug Control Pol'y, Iowa Drug Control Strategy 2017 at 47 (Dec. 1, 2016). Indeed, the trend is also the same in Sioux City, where Nawanna committed his drug offenses, because at a recent sentencing hearing in this court, a Sioux City Police Sergeant testified that recent cases from Sioux City generally involve "97, 98, 99 percent pure" methamphetamine, but that when he was on the DEA's Tri-State Task Force from 1999 until 2004, "we would get purities as low as 8 percent." *United States v. Madison*, No. CR15-4072-LTS, Doc. No.

68 at 44-45 (N.D. Iowa). Again, the prosecution does not dispute that this is the trend, in Sioux City, in Iowa, and nationwide.

I also conclude that Nawanna is correct that the Commission's emphasis on an outdated assumption about methamphetamine purity as a proxy for culpability can lead to perverse sentencing outcomes. He offers the following example: Defendant A, who sold 5 grams of methamphetamine to his five customers (1 gram per customer), versus Defendant B, who sold 49 grams of methamphetamine to 25 customers (almost 2 grams per customer). Without other adjustments, if Defendant A's methamphetamine is treated as ice or actual (pure) methamphetamine, his resulting base offense level is 24. Similarly, without other adjustments, if Defendant B's methamphetamine is treated as a mixture, his base offense level is 22. Thus, the Commission's judgment is that Defendant A is more culpable, even though he sold far less methamphetamine to far fewer people, but that is contrary to what a reasonable observer would likely conclude.[7]

Furthermore, the United States Sentencing Commission's 2017 Datafile, for fiscal year 2017, demonstrates the harshness of the treatment of methamphetamine offenses. The average and median length of imprisonment for methamphetamine offenders during

---

[7] In response, the prosecution argues that, if Nawanna's position is adopted, it leads to the perverse result that a defendant who sold 150 grams of pure methamphetamine, treated as pure methamphetamine, would be treated the same as a defendant who sold 4 kilograms of actual (pure) methamphetamine whose methamphetamine was treated as a mixture. That is precisely the result of the *current* Guidelines calculation, based on the 10-to-1 ratio, which would score both defendants as level 32. U.S.S.G. § 2D1.1(c)(4). On the other hand, if the methamphetamine attributed to both defendants is treated as methamphetamine mixture, as Nawanna argues it should be, the defendant who sold 150 grams of methamphetamine would be scored as level 24, while the defendant who sold 4 kilograms of methamphetamine would still be scored as level 32. This difference *does* more properly reflect the relative culpability of the two defendants.

fiscal year 2017 were 91 months and 72 months, respectively, higher than for any other drug, and a 30% higher average and a 26.32% higher median than for heroin (70 months and 57 months, respectively). *See* U.S. Sentencing Commission, 2017 Datafile, USSCFY17, Figure J.[8] Also, while 44.3% of all drug defendants received mandatory minimum sentences of either 5 years or 10 years during fiscal year 2017, 51.9% of methamphetamine offenders did. The percentage for methamphetamine offenders was higher than for any other drug except powder cocaine (58%), well-exceeded the percentage for other drugs, and was the only other one exceeding 50%. *Id*. at Table 43.[9] Similarly, 3,943 of 7,077 methamphetamine offenders (55.72%) had base offense levels of 32 or higher under the Guidelines during the same period, as compared to 6,113 of 18,935 total drug offenders (33.28%). This percentage for methamphetamine offenders was considerably higher than for any other drug offenders, and, again, the only one exceeding 50% of offenders. *Id*. at Table 42A.[10] The harsh treatment of

---

[8] The average and median length of imprisonment for other drug offenders in fiscal year 2017 was as follows: 75 months and 60 months, respectively, for powder cocaine; 84 months and 66 months, respectively, for crack cocaine; 70 months and 57 months, respectively, for heroin; 29 months and 18 months, respectively, for marijuana; and 61 months and 41 months, respectively, for "other" drugs. *See* U.S. Sentencing Commission, 2017 Datafile, USSCFY17, Figure J.

[9] The percentage of other drug offenders who received mandatory minimums in fiscal year 2017 was as follows: 43.6% for crack cocaine; 42.6% for heroin; 24.7% for marijuana; and 7.5% for "other." *See* U.S. Sentencing Commission, 2017 Datafile, USSCFY17, Table 43

[10] The percentages of other drug offenders who had base offense levels 32 or higher in fiscal year 2017 was as follows: 1,265 of 3,736 powder cocaine offenders (33.86%); 166 of 1,526 crack cocaine offenders (10.88%); 396 of 2,626 heroin offenders (15.08%); 83 of 2,696 marijuana offenders (3.08%); and 260 of 1,274 "other" drug offenders (20.41%). *See* U.S. Sentencing Commission, 2017 Datafile, USSCFY17, Table 42A.

methamphetamine offenses is also apparent from the relative low percentage of methamphetamine offenders, compared to other drug offenders, who receive Guidelines enhancements for commission of drug offenses near protected locations or for an aggravating role in the offense during fiscal year 2017.  Only 0.1% of methamphetamine offenders received a "protected location" enhancement, while 1.5% of total drug offenders received that enhancement, making methamphetamine offenders 15 times less likely to receive such an enhancement.  No other percentage of drug offenders was anywhere near as low.  *Id.* at Table 33.[11]  Similarly, 5.8% of methamphetamine offenders received an "aggravating role" adjustment, as compared to 7.2% of total drug offenders, and that percentage for methamphetamine offenders was lower than for any other drug offenders except marijuana offenders.  *Id.* at Table 40.[12]

In light of these statistics, I agree with Chief Judge B. Lynn Winmill of the United States District Court for the District of Idaho that "[d]ue to increases in the average purity of methamphetamine sold today, purity is no longer an accurate indicator of a defendant's culpability or role in a drug enterprise."  *United States v. Hartle*, No. 4:16-cv-00233-BLW, 2017 WL 2608221 at *1 (D. Idaho June 15, 2017); *see also id.* at *2 (noting increases in purity levels of methamphetamine over time in the District of Idaho and nationwide).  To put it a different way, I agree with the assessment by Judge Robert C.

---

[11] The percentage of other drug offenders who received a "protected location" enhancement during fiscal year 2017 was as follows:  4.5% of powder cocaine offenders; 3.2% of crack cocaine offenders; 1.0% of heroin offenders; 0.4% of marijuana offenders; and 0.9% of "other" drug offenders.  *See* U.S. Sentencing Commission, 2017 Datafile, USSCFY17, Table 33.

[12] The percentage of other drug offenders who received an "aggravating role" enhancement during fiscal year 2017 was as follows:  8.8% of powder cocaine offenders; 6.9% of crack cocaine offenders; 9.2% of heroin offenders; 4.6% of marijuana offenders; and 11.7% of "other" drug offenders.  *See* U.S. Sentencing Commission, 2017 Datafile, USSCFY17, Table 40.

Brack of the District of New Mexico that "the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality." *Ibarra-Sandoval*, 265 F. Supp. 3d at 1255. As Nawanna correctly observes, because of the generally very high purity of methamphetamine available today at all levels of the distribution chain, virtually all defendants today face enhanced punishment for a factor present in virtually all methamphetamine cases, not enhanced punishment based on individualized determinations, making the Guidelines purity enhancement excessive. *Cf. Hayes*, 948 F. Supp. 2d at 1027-29. Moreover, because the purity-based methamphetamine Guidelines improperly punish virtually all defendants for their *assumed* role in the offense, Nawanna argues they result in a sort of "double counting" when a defendant is further enhanced for his or her *actual* role in the offense pursuant to U.S.S.G. § 3B1.1(b).

The prosecution has three responses to these conclusions that bear some examination. First, the prosecution argues that, while drug purity may no longer be the best predictor of where on the distribution chain the defendant is, or how close he is to the supplier, the quantities dealt in relation to the dosage units are still an accurate picture of how dangerous the substance is, and how big a player the defendant is in the local area. This argument may justify *quantity*-based differences in defendants' Guidelines ranges, and the Guidelines do distinguish among defendants based on quantity, but it is no argument for *purity*-based differences, which is the basis for my policy disagreement.

Second, the prosecution argues that the purity-based methamphetamine Guidelines punish different conduct from the "role in the offense" Guideline. The prosecution argues that Nawanna is not being punished because he is higher up the drug distribution chain, but rather for his use of underlings to act as "muscle," or as his "driver," or as his "hand to hand" man, and that the purity of the drugs, here, is irrelevant to his use of others in his drug conspiracy, because purity is not the only way to determine whether a

defendant is high in the distribution chain. The flaw in the prosecution's argument is that, while Nawanna's 3-level enhancement for "role in the offense," pursuant to U.S.S.G. § 3B1.1(b), is a *defendant-specific* enhancement, based on his *actual* role as "a manager or supervisor (but not an organizer or leader) and the criminal activity that involved five or more participants or was otherwise extensive," *see* PSR at ¶ 28, his Guidelines sentence has already been enhanced based on a *flawed assumption* about his role in the offense, based simply on purity, without any individualized determination. The proper way to consider Nawanna's role in the offense, I conclude, is not based on such an assumption, particularly a demonstrably erroneous assumption, based on purity, but on an individualized determination pursuant to U.S.S.G. § 3B1.1. This does not mean that I believe the current methamphetamine Guidelines result in "double counting," as that term has been defined in the case law.

Third, the prosecution argues that, if methamphetamine currently available at all levels of the distribution chain is generally actual (pure) methamphetamine or ice, it would be more logical to treat all methamphetamine as pure, because it would more appropriately indicate culpability based on larger quantities. This argument, however, also simply carries forward the flawed assumption that purity is indicative of role in the offense, so that offenses involving pure methamphetamine should be punished more harshly. It then would apply that flawed assumption to *all* methamphetamine defendants. Thus, the prosecution's suggestion would skew the effect of the methamphetamine Guidelines toward harsher punishment of *all* methamphetamine defendants, without regard to their actual role in the offense. Again, U.S.S.G. § 3B1.1 provides the proper, defendant-specific consideration of actual role in the offense.

Because I conclude that the methamphetamine Guidelines are based on a flawed assumption that methamphetamine purity is a proxy for role in the offense, I reject them based on a policy disagreement.

## B.    Application

Because I reject the purity-based methamphetamine Guidelines on the basis of a policy disagreement, I turn to application of the Guidelines in a way that remedies the flaw. *See Hayes*, 948 F. Supp. 2d at 1031-33.  In *Hayes*, I concluded that a one-third reduction was a good starting point and a reasonable way to express my policy disagreement with these Guidelines. *Id*. at 1031.  After reducing the advisory Guidelines sentencing range by one third to account for my policy disagreement, I reserved the ability to adjust the figure upwards and downwards as I weighed the 18 U.S.C. § 3553(a) factors.  This included whether the base offense level, based on the weight of the drugs the defendant is held accountable for, is an accurate proxy for the defendant's culpability. *See* 18 U.S.C. § 3553(a)(1) ("the nature and circumstances of the offense and the history and characteristics of the defendant").  More specifically,

> As I have done with policy disagreements in prior cases, I will calculate the Guidelines range under the existing Guidelines, and then I will calculate an alternative Guidelines range based on a one third reduction.  Next, I will either use or vary from that alternative Guidelines range depending upon my consideration of the 18 U.S.C. § 3553(a) factors. This methodology for determining a defendant's sentence is consistent with the three-step process reiterated by the Eighth Circuit Court of Appeals.

*Hayes*, 948 F. Supp. 2d at 1031 (citing *United States v. Roberson*, 517 F.3d 990, 993 (8th Cir. 2008), and *United States v. Mireles*, 617 F.3d 1009, 1012 (8th Cir. 2010)).

Here, as in *Hayes*, I began with Nawanna's advisory Guidelines sentencing range. As explained, above, Nawanna's advisory Guidelines sentencing range is 360 months to life.  He faces a mandatory minimum sentence of 120 months, pursuant to 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).  *See* PSR ¶ 89.  As in *Hayes*, there were no departure

motions before me.  Where I parted company with my decision in *Hayes*, however, was that I did not simply reduce Nawanna's advisory Guidelines sentencing range by one third (from the low end of 360 months down to 240 months to life) on the basis of a policy rejection of the methamphetamine Guidelines.  Such a block reduction was not appropriate, here, where Nawanna, unlike Hayes, was not merely a low-level, generally non-violent addict dealer.  Rather, Nawanna's alternative advisory Guidelines base offense level and alternative advisory Guidelines sentencing range could be precisely computed by treating all the methamphetamine attributable to Nawanna as methamphetamine mixture.  I could then determine whether this alternative advisory Guidelines sentencing range was appropriate, based on all the factors and circumstances in the case.

Here, using marijuana equivalencies for the sake of consistency with the original Guidelines calculation, 33.158 grams of actual (pure) methamphetamine, treated as methamphetamine mixture, have a marijuana equivalency of 66.316 kilograms, and the 4,406.39 grams of ice, treated as methamphetamine mixture, have a marijuana equivalency of 8,812.78 kilograms, where 1 gram of methamphetamine mixture is deemed equivalent to 2 kilograms of marijuana.  U.S.S.G. § 2D1.1, cmt. n.8(D).  This yields a total of 8,879.096 kilograms of marijuana equivalency.  The base offense level for at least 3,000 kilograms but less than 9,000 kilograms of marijuana is 32.  U.S.S.G. § 2D1.1(c)(4).  The conversion to marijuana equivalency starkly demonstrates the effect of the 10-to-1 ratio in the current Guidelines, because treating all the methamphetamine at issue as actual (pure) methamphetamine resulted in a total of 88,790.96 kilograms of marijuana equivalency, PSR at ¶ 24, and a base offense level of 36.  U.S.S.G. § 2D1.1(c)(2).  However, if all the methamphetamine at issue in Nawanna's case is treated as methamphetamine mixture, simple addition, rather than a conversion to marijuana equivalency, is all that is necessary:  33.158 grams plus 4,406.39 grams equals

4,459.548 grams (4.459548 kilograms) of methamphetamine mixture, and the base offense level for at least 1.5 kilograms but less than 5 kilograms of methamphetamine mixture is, once again, 32. U.S.S.G. § 2D1.1(c)(4).

Continuing my alternative advisory Guidelines computation, Nawanna's advisory Guidelines sentencing range was increased by 2 levels for the specific offense characteristic of possession of a dangerous weapon, pursuant to U.S.S.G. § 2D1.1(b)(1), then increased by 3 levels as an adjustment for his role in the offense as a manager or supervisor (but not an organizer or leader) and criminal activity involving five or more participants, pursuant to U.S.S.G. § 3B1.1(b). With no adjustment for obstruction of justice, Nawanna's alternative adjusted offense level was 37. The PSR also scores a 2-level decrease for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a), and another 1-level decrease for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(b), where the prosecution did make the required motion. Thus, Nawanna's alternative total offense level was 34. With a criminal history category of V, based on 10 criminal history points, pursuant to U.S.S.G. § 4A1.1, Nawanna's alternative advisory Guidelines sentencing range was 235 to 293 months.

Next, I considered the 18 U.S.C. § 3553(a) factors to determine what sentence was sufficient, but not greater than necessary, to serve the purposes of sentencing. 18 U.S.C. § 3553(a). As I observed during the sentencing hearing, this was not a case in which the bottom of the alternative advisory Guidelines range, based on my policy disagreement with the purity-based methamphetamine Guidelines, was necessarily the appropriate point for a downward variance based on other factors. In this case, I found the following factors to be aggravating: Nawanna's proximity to the next base offense level, based on any calculation of quantity used in this case; his use of firearms and his association with people who had firearms, particularly when involved with large quantities of methamphetamine; and his two prior convictions for assaults, including a

domestic abuse assault. On the other hand, I found the following factors to be mitigating: Nawanna's addiction to alcohol and methamphetamine; his difficult family situation growing up, including the death of his mother and having an abusive father, and the later death of his daughter and the loss of custody of his sons, although his life has not been as difficult as many other defendants I have sentenced; the fact that most of his criminal convictions relate to driving, rather than other kinds of criminal conduct; and the unusual circumstance that he is a first-time drug defendant. In light of these additional circumstances, I concluded that a relatively modest downward variance from Nawanna's alternative Guidelines sentencing range to 200 months was appropriate.

For the sake of comparison, Nawanna's case is distinguishable from Hayes's case, because Hayes was a low-level, addict offender to whom at least 35 grams but less than 50 grams of actual (pure) methamphetamine were attributed, subject only to a 60-month mandatory minimum, who did not receive any enhancements for role in the offense or possession of firearms. *Hayes*, 948 F. Supp. 2d at 1011 and 1032. I also granted in part Hayes's objection to the career offender enhancement. *Id*. at 1032. This resulted in a advisory Guidelines sentencing range for Hayes of 151 to 188 months, which I reduced by one third to 100 months, then I applied a further 25% reduction for substantial assistance under U.S.S.G. § 5K1.1, resulting in a final sentence of 75 months. *Id*. at 1032-33. I am not giving Nawanna a "*Hayes* variance" because he does not meet the criteria for it. In contrast to Hayes, Nawanna was a large-scale distributor, with a managerial or supervisory role in the enterprise (although he was not an organizer or leader), he possessed a dangerous weapon, and I did not find that any adjustment of his criminal history level was appropriate. On the other hand, the prosecution also moved for a reduction of Nawanna's sentence for substantial assistance.

I first learned that the prosecution was making a departure motion for substantial assistance, pursuant to U.S.S.G. § 5K1.1 at the sentencing hearing. For the reasons

stated on the record, I concluded that a further reduction of Nawanna's sentence for substantial assistance by approximately one third, to 132 months, was appropriate.

My analysis of the § 3553(a) factors and the prosecution's substantial assistance motion resulted in a sentence of 132 months. I determined that a sentence of 132 months of incarceration was sufficient, but not greater than necessary, in light of all the circumstances in this case.[13]

## III. CONCLUSION

Exercising my discretion to reject the advisory Guidelines sentencing range for methamphetamine offenses on the basis of a policy disagreement, I determined that a downward variance was appropriate in Nawanna's case. The reasons for rejecting the methamphetamine Guidelines, here, were independent of the reasons for rejecting the methamphetamine Guidelines set out in my decision in *Hayes*. Here, I concluded that the methamphetamine Guidelines are based on a flawed assumption that methamphetamine purity is a proxy for role in the offense, which, like Judge Robert C. Brack of the District of New Mexico, I find "is divorced from reality." *Ibarra-Sandoval*, 265 F. Supp. 3d at 1255. Nawanna's advisory Guidelines sentencing range of 360 months to life would be greater than necessary to accomplish the purposes of sentencing under 18 U.S.C. § 3553(a). Instead, for the reasons stated, above, and on the record during Nawanna's sentencing hearing, Nawanna should be sentenced to 132 months incarceration.

---

[13] At the sentencing hearing, the prosecution requested that this decision address the "All Drugs Minus Two Amendment" to the Guidelines, Amendment 782, which went into effect in November 2014, after my decision in *Hayes*, but before Nawanna was indicted. In my view, the "All Drugs Minus Two Amendment" has no impact on the determination of Nawanna's sentence, although it did generally reduce some of the harshness, for all defendants, of the drug Guidelines to which it applies.

A Judgment of Conviction in accordance with this Sentencing Memorandum will issue this date.

**IT IS SO ORDERED**.

**DATED** this 1st day of May, 2018.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA